**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES : | |
| : | **CRIMINAL ACTION** |
| v. : | |
| : | No. 13-176-4 |
| WALTER ALSTON BROWN, JR. : | |

**MEMORANDUM**

**Schiller, J.**                                                                                                              **October 20, 2020**

Before the Court is Defendant Walter Brown's motion for compassionate release. For the reasons that follow, the motion is granted.

**I.      FACTUAL BACKGROUND**

Between 2004 and 2009, Brown participated in a sophisticated mortgage-fraud conspiracy that resulted in millions of dollars in losses to various lenders. Brown's cousin would locate distressed properties and straw buyers with good credit to purchase the properties cheaply. Then, inflated appraisals and false employment and financial documents were submitted to lenders in order to secure mortgage funds in excess of the actual purchase price of the property. Brown was a mortgage broker who knowingly submitted false loan applications and supporting documents to lenders, including his employer. Brown was convicted by a jury of conspiracy to commit loan and wire fraud, making false statements in an FHA loan, loan fraud, and tax evasion. This Court sentenced Brown to 180 months of imprisonment, to be followed by five years of supervised release. Brown's projected release date is December 8, 2027.

Brown is serving his sentence at FCI Ashland in Ashland, Kentucky. His medical records indicate, and the Government concedes that Brown is 53 years old, is severely obese (BMI of 43.5), and suffers from hypertension. Based on these medical conditions, and in light of the coronavirus pandemic, Brown asks this Court to reduce his sentence to time served. Brown

1

requested that the BOP bring a motion for compassionate release on his behalf on May 18, 2020, and the warden denied his request on May 28, 2020. He filed the instant motion after more than 30 days had passed from the date the warden received his request. The Government filed its response in opposition to Brown's motion on October 8, 2020. For the reasons that follow, the Court will grant the motion for compassionate release.

## II. DISCUSSION

### A. Compassionate Release Statute

Under 18 U.S.C. § 3582(C)(1)(A)(i), a judge may reduce an inmate's sentence if four conditions are met. First, the inmate must satisfy an administrative exhaustion requirement. It is uncontested that Brown has satisfied this requirement. Second, the Court must find that "extraordinary and compelling reasons warrant such a reduction." Third, any reduction granted by the Court must be "consistent with any applicable policy statements issued by the Sentencing Commission." And finally, the proposed reduction must be consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a).

While Congress has not defined "extraordinary and compelling," the Sentencing Commission has issued a policy statement with helpful guidance.[1] Pursuant to that statement, extraordinary and compelling reasons for modification of sentence exist where, "[t]he defendant is suffering from a terminal illness . . . [or] suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.'" U.S.S.G. § 1B1.13 cmt n.1(A). "The government

---

[1] This Court has repeatedly rejected the Government's argument that the policy statement is binding on the Court, and will continue to follow the conclusion reached by the majority of courts that have considered the issue. *See e.g.*, *United States v. Rodriquez*, Crim. A. No. 03-271, -- F. Supp. 3d --, 2020 WL 1627331 at *1 (E.D. Pa. Apr. 1, 2020). The Court retains the discretion to independently assess whether a defendant has presented extraordinary and compelling reasons beyond those contained in an outdated policy statement.

acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19" qualifies as having extraordinary and compelling reasons for compassionate release under note 1(A). (Gov't Resp. in Opp'n to Def.'s Mot. for Compassionate Release ["Gov't's Opp'n"] at 17.) Courts generally require proof of such a medical condition and "more than mere speculative risk of exposure to the virus at the prison where the inmate is housed" to meet the extraordinary and compelling test. *United States v. Phillips*, Crim. A. No. 09-718, 2020 WL 5076753 at *3 (E.D. Pa. Aug. 27, 2020).

If an extraordinary and compelling reason for immediate release exists, the Court must decide whether release is appropriate in light of the § 3553(a) factors. The relevant factors the Court must consider include the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, promote respect for law, provide just punishment, provide adequate deterrence, protect the public from further crimes, and provide the defendant with needed correctional treatment in the most effective manner; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(1-2,6).

**B.     The Pandemic and the Situation at FCI Ashland**

The Court will not write at length about the havoc wreaked by COVID-19 in the United States. The virus, coupled with the abysmal response to it throughout much of this country, has led to the death of over 220,000 people (and counting) in the United States. While the virus can be dangerous for anyone, people with certain underlying medical conditions and older adults are at increased risk of severe illness or death from COVID-19. *People Who Are At Increased Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Oct. 16, 2020). Prisons have been hit particularly hard by the

pandemic, as they present numerous environmental factors favorable to the spread of the virus. *See United States v. Rodriguez*, Crim. A. No. 03-271, 2020 WL 1627331, at *1, 8-9 (E.D. Pa. Apr. 1, 2020) ("Prisons are tinderboxes for infectious disease.").

Brown notes that FCI Ashland has reported confirmed cases of COVID-19 among both inmates and staff. (Def.'s Mot. for Compassionate Release [Def.'s Mot.] at 8, Def.'s Mem. of Law in Supp. of Mot. for Compassionate Release at 4-7.) He expresses concern regarding the nature of the housing units at FCI Ashland, where he asserts that social distancing is impossible, and that inmates are exposed to staff and other inmate workers that travel between facilities and assignments and then return to housing units without being tested or quarantined. (Def.'s Mot. at 5.)

The Government contends that the low number of reported infections at FCI Ashland is conclusive evidence that BOP containment measures have been successful. According to the Government, "[w]hen a prison goes month after month with few or no known symptomatic cases, having taken the extraordinary mitigation measures that BOP is taking, it is sensible to conclude that the known positive rate is a product of those efforts and not the absence of widespread testing." (Gov.'t Opp'n at 11.) This Court, however, believes that a low "**known** positive rate" could also be explained by the absence of widespread testing, and is not nearly as persuasive evidence of extraordinary mitigation as a test-confirmed, universal, low positive rate would be.[2] Perhaps there

---

[2] Indeed, throughout the pandemic, prisons that have implemented universal testing strategies routinely found much higher rates of infection than had been previously known. *See* Nichols Rondinone, *56 Inmates at Hartford Correctional Center test positive for COVID-19*, Hartford Courant, (Oct. 15, 2020), https://www.courant.com/breaking-news/hc-br-doc-covid-19-hartford-correctional-20201015-yv7i2fbkqna2dkzb3utk3ujy3i-story.html ("Two DOC employees at [Hartford Correctional Center] had recently contracted the virus, so officials began testing inmates who may have come in contact with the employees and found that 56 were positive for the virus. DOC officials said that all those inmates were not showing symptoms."); Kevin Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort*, USA Today, Updated Apr. 27, 2020, https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/ (last visited Oct. 16, 2020) ("In one dormitory at

are relatively few active cases of COVID-19 at FCI Ashland, but without expansive testing, the Court will not presume the reported cases accurately reflect the extent of infections in the facility.

In fact, the Court is somewhat skeptical of the Government's confidence in BOP containment efforts. The BOP did not institute a policy requiring staff to wear face masks until August 27, 2020. *See* Fed. Bur. Of Prisons Memo for Chief Executive Officers, Mandatory Use of Face Covering For BOP Staff (Aug. 24, 2020), *available at* https://www.bop.gov/foia/docs//Mandatory_Use_Face_Coverings_for_Staff_08242020.pdf. Further, because they are critical infrastructure workers, BOP employees are instructed to continue working after potential exposure to COVID-19 so long as they remain asymptomatic and go through "enhanced screening" at the institution. *See* Fed. Bur. Of Prisons, COVID-19 Pandemic Response

---

Marion [Correctional Institution in Ohio], officials said that of the 152 prisoners tested, 39% tested positive for COVID-19 even though they displayed no symptoms."); Cary Aspinwall and Joseph Neff, *These Prisons are Doing Mass Testing For COVID-19—And Finding Mass Infections*, The Marshall Project (Apr. 24, 2020), https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections ("When coronavirus cases began to spike at North Carolina's Neuse Correctional Institution…prison officials took the opposite approach, testing all 700 inmates and 250 staff. They found at least 65 percent of the prisoners have the virus…98 percent of those infected were not showing symptoms."); Jeremy Roebuck, *Six percent of asymptomatic Philly inmates tested positive for COVID-19 as jails move to the 'yellow' phase*, The Philadelphia Inquirer (Updated June 5, 2020) https://www.inquirer.com/news/coronavirus-philly-jails-inmates-universal-testing-class-action-lawsuit-settlement-20200605.html. (finding, after universal testing of inmates in, "roughly 18% of [Philadelphia Department of Prisons] jail population was shown to be infected with the coronavirus but were asymptomatic[.]"); Jeremy Roebuck and Allison Steele, *Montgomery County's jail tested every inmate for COVID-19—and found 30 times more cases than previously known*, The Philadelphia Inquirer (Updated Apr. 28, 2020) https://www.inquirer.com/news/coronavirus-testing-montgomery-county-jail-asymptomatic-philadelphia-prisons-20200428.html. ("Of the 948 inmates, 177—or roughly 18% of the county's incarcerated population—tested positive, a rate of infection more than 30 times greater than what Montgomery County had identified before it began its mass testing[.]"); Peter Dujardin, *Nearly 25% of inmates at Chesapeake state prison test positive for COVID-19*, The Virginian-Pilot (July 29, 2020), https://www.pilotonline.com/news/health/dp-nw-covid-chesapeake-prison-20200729-pxe6hhotijc4taotd3yiopvik4-story.html (finding, after all inmates at the facility were tested, that "[n]early a quarter of the inmates" tested positive after only a few positive cases were reported at a Virginia prison).

Plan, Module 11 BOP Employee Management, at 3 (Sept. 11, 2020), *available at* https://www.bop.gov/foia/docs//Mod_11_Employee_Management_of_COVID_Pandemic_Response_Plan_08312020.pdf (defining "potential exposure" as "[h]aving close contact within 6 feet of an individual with confirmed or suspected COVID-19 for greater than 15 minutes while not wearing recommended PPE [(personal protective equipment)]."). It is true that the CDC advises critical infrastructure workers may be permitted to continue work following potential exposure to COVID-19, provided they remain asymptomatic and additional precautions are implemented to protect them and the community. *Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19*, CDC, updated Sept. 11, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html (last visited Oct. 16, 2020). However, the CDC also recommends testing for all close contacts of a person infected with COVID-19 and cautions that symptom screening cannot identify individuals with COVID-19 who may be asymptomatic or pre-symptomatic. *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, CDC, updated Aug. 10, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last visited Oct. 16, 2020). BOP mentions no testing protocol for asymptomatic employees who have potential exposure to COVID. In light of the presence of confirmed cases of COVID-19 at FCI Ashland, and the BOP's protocols which do not include mass-testing of inmates or any testing of staff, even when staff report potential exposure to COVID-19, the Court finds there is more than a mere speculative risk of infection at FCI Ashland.

    **C.**     **Extraordinary and Compelling Reasons**

The Government acknowledges that Brown suffers from conditions that the CDC recognizes as putting a person at increased risk of serious illness or death if infected with COVID-

19.[3] The Government acknowledges that Brown's obesity meets the test of extraordinary and compelling under note 1(A), as "the defendant may be less able to protect himself against an unfavorable outcome" from COVID-19, but also contends that Brown's "medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution." (Gov't's Opp'n at 17-18.) Indeed, the Government argues, "obesity is something that can be managed by diet and exercise." (*Id*. at 17.) It does not, however, explain how Brown might manage his condition now, as BOP has "severely limited the movement of inmates and detainees" and "requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease." (*Id*. at 7.)

Even if it were expected that Brown could resolve his obesity at some point in the future through use of the Government's suggested lifestyle tips, he could not possibly recover quickly enough to protect himself from the immediate threat of COVID-19 in his prison facility and the severe or possibly fatal consequences he could suffer because of his obesity if he contracts the virus. "Courts have granted compassionate release to incarcerated individuals with obesity and sleep apnea because those conditions place them at high risk for serious complications due to COVID-19." *United States v. Delgado*, Crim. A. No. 18-17, 2020 WL 2464685, at *4 (D. Conn. Apr. 30, 2020) (citing cases)*; see also United States v. Franco*, Crim. A. No. 12-932, 2020 WL 4344834, *2 (S.D.N.Y. June 24, 2020) ("The Government concedes that defendant's health conditions [diabetes, hypertension, and obesity] establish 'extraordinary and compelling reasons' for his release[.]"); *United States v. Foreman*, Crim A. No. 19-62, 2020 WL 2315908, *4 (D. Conn.

---

[3] "The CDC recognizes that the following underlying medical conditions place individuals at a greater risk of severe illness from COVID-19: cancer; chronic kidney disease; chronic obstructive pulmonary disease; an immunosuppressed state as a result of an organ transplant; obesity (body mass index "BMI" of 30 or higher); serious heart conditions; sickle cell disease; and type II diabetes." *Phillips*, 2020 WL 5076753 at *3.

May 11, 2020) (finding that obesity and hypertension constitute extraordinary and compelling reasons justifying release in the midst of the COVID-19 pandemic.); *United States v. Rivera*, 2020 WL 5105090, *4 (E.D. Mich. Aug. 31, 2020) (finding that a defendant with obesity, hypertension, and sleep apnea, housed in a facility with known cases of COVID-19, presents an extraordinary and compelling situation); *United States v. Colvin*, 451 F. Supp. 3d 237, 241 (D. Conn. Apr. 2, 2020) (finding extraordinary and compelling reasons justified compassionate release during COVID-19 pandemic for inmate with high blood pressure and diabetes).

The confirmed presence of COVID-19 at FCI Ashland, despite the BOP's procedures to prevent transmission, underscores the ongoing risk of contracting the virus and suffering severe illness or death as a result to inmates with Brown's medical conditions. "There currently are no cures, vaccines, or accepted treatments for COVID-19, and the only effective way to protect vulnerable people from injury or death from COVID-19 is to prevent individuals from being infected with the COVID-19 virus." *Pimentel-Estrada v. Barr*, Civ. A. No. 20-495, 2020 WL 2092430, at *3 (W.D. Wash. Apr. 28, 2020) (internal quotation marks omitted). The Court finds that extraordinary and compelling reasons exist to reduce Brown's term of imprisonment.

**D.     Consistency with Sentencing Considerations**

Once Brown has demonstrated an "extraordinary and compelling" reason for his compassionate release, the Court must decide whether release is appropriate in light of the § 3553(a) factors. The relevant factors the Court must consider include the nature and circumstances of the offense; the defendant's history and characteristics; the kinds of sentences available; the need for the sentence to reflect the seriousness of the offense, promote respect for law, provide just punishment, provide adequate deterrence, protect the public from further crimes, and provide the defendant with needed correctional treatment in the most effective manner; and

the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(1-2,6). This determination is left to the discretion of the district court. *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020). The Court finds that, upon weighing the extraordinary and compelling reasons for Brown's reduction of sentence against the sentencing considerations set forth in Section 3553(a), he is entitled to compassionate release.

The Government contends that Brown is not entitled to compassionate release because "he continues to present an economic danger to the community[.]" (Gov't's Opp'n at 18.) However, Brown's record in prison, as well as his proposed release plan, demonstrate that the opposite is true. Brown has a Risk Pattern score of -12, which puts him in the lowest risk-of-recidivism category according to the BOP. Moreover, prior to the offense of conviction, Brown had a very limited criminal history (Category I) and no history of violence whatsoever. Further, "[i]n an effort to self rehabilitate, [Brown has] completed several classes" in prison. (Def.'s Mot. at 6.) For example, Brown completed a Master Gardening class and was awarded a Master Gardening Certificate from the University of Kentucky. (*Id*.) He was also "selected to participate in the Business Management Apprenticeship Program with the Department of Labor, in conjunction with the BOP" as a result of his work as clerk of the garage at FCI Ashland. (*Id*.) As of July 10, 2020, Brown had completed 2,800 hours of the 3,000-hour program. (*Id*.) And finally, Brown asserts that he has "a solid release plan to ensure [his] reentry into society is a success." (*Id*. at 7.) Brown would be released to live with his wife in Virginia, where he would have access to proper medical care and would be covered by his wife's health insurance within 30 days of release. (*Id*.) Brown also has a plan to be employed upon his release. (*Id*.)

Without question, Brown's crimes were serious and they were not victimless, a fact that Brown realizes. Brown took advantage of his position and greatly harmed the community. The Court does not believe, however, that Brown is presently a danger to the community. These crimes took place more than a decade ago, and while they had very real consequences, were not violent in nature. The Court is sympathetic to the anxiety and emotional distress that inevitably flows from the threat of COVID-19 in prison, especially to a person who is in high-risk categories for severe illness or death. Under such circumstances, the Court believes that the need for punitive measures and effective correctional treatment can be accomplished with a shorter period of incarceration. The Court finds that in light of Brown's medical conditions, the COVID-19 pandemic, and his extensive efforts at rehabilitation while in prison, the time Brown has already served sufficiently reflects the seriousness of his crimes and has provided adequate deterrence to future criminal conduct. Additionally, the Court has already granted a request for compassionate release to Brown's cousin, who was the mastermind of the conspiracy. In this case, granting Brown's motion also avoids an unwarranted sentencing disparity.

The Court has determined that Brown's rehabilitation will be best served by reducing his period of incarceration to the time he has already served and allowing him to return home to begin his originally-imposed term of supervised release.

### III.    CONCLUSION

For the foregoing reasons, Walter Brown's motion for compassion release under 18 U.S.C. § 3582(c)(1)(A)(i) is granted. An Order consistent with this Memorandum will be docketed separately.